ABEL, (COBLENS v.)

[See Coblens v. Abel, Case No. 2,926.]

ABENHEIM, (FUTTERER v.)

[See Futterer v. Abenheim, Case No. 5,164.]

## Case No. 16.

### The ABERFOYLE.

[Abb. Adm. 242.][1]

District Court, S. D. New York. April, 1848.[2]

SHIPPING—PASSENGERS—LIABILITY IN REM—CHARTER-PARTY.

1. A charter-party, sounding wholly in covenant, contained agreements on the part of the owner that the vessel was fit for the voyage,—that she should take in a cargo to be furnished by the charterer, reserving her cabin and room for her crew, water, provisions, &c.,—that the privilege of putting on board steerage passengers should belong solely to the charterer, and that if the ship should be unable to carry cargo and passengers to the stipulated amount, there should be a reduction of freight. On the part of the charterer, it was agreed that he should furnish the cargo — should pay a stipulated freight and demurrage in case of delay in loading, &c. Held, that this charter-party, construed under the presumption of law against a change of ownership, and in the light of the acts of the parties under it, was but an affreightment for the voyage, and not a letting of the entire ship, so as to constitute the charterer owner for the voyage.

2. Ships carrying passengers for hire stand upon the same footing in respect to their responsibility in rem for the performance of the passage contract, with those carrying merchandise on freight.

[Cited in Marshall v. Bazin, Case No. 9,125.]

3. Ships carrying passengers for hire are liable in rem for wrongful acts of the master in his capacity as such; but not, it seems, for acts of mere personal private malice or ill-will.

[Cited in Pendleton v. Kinsley, Case No. 10,922.]

4. Where a passenger is put on short allowance by the master, the latter will not be presumed to have acted from personal malice; and if such short allowance be a violation of the passage contract, the ship will be held liable unless it is shown that the master's conduct was malicious and wrongful.

[5. Cited in Donahoe v. Kettell, Case No. 3,980, and Richardson v. Winsor, Id. 11,795, as authority for holding that, if the due attainment of the object sought by the charter-party requires that vessel be absolutely under the control of the charterer, then the services of the master and crew pass as merely accessorial to the principal subject-matter of the contract.]

In admiralty. This was a libel in rem, by Peter McDonald, prosecuting for himself and on behalf of his wife and minor children, against the ship Aberfoyle, to recover damages for breach of a contract for the passage of libellant and his family. [The decree rendered herein was affirmed by the circuit court in The Aberfoyle, Case No. 17.]

Samuel R. Graves, owner of the vessel,

[1][Reported by Abbott Bros.]

[2][Affirmed by the circuit court in The Aberfoyle, Case No. 17.]

filed a claim and answer. The cause came on for a hearing upon the merits, and was heard upon an agreed statement of facts, instead of on pleadings and proofs. The facts as stipulated were substantially as follows:— The claimant, Samuel R. Graves, was, during December, 1846, and thereafter, the owner of the Aberfoyle. December 9, 1846, he executed a charter-party of the vessel to one William Quayle, of Liverpool, by which it was mutually agreed, amongst other things, that the vessel should take on board a cargo of general goods and merchandise, together with a full legal complement of steerage passengers, their luggage, water, provisions, fuel, &c.; that being so loaded she should proceed to New York; that the cargo should not exceed what she could reasonably stow and carry over and above her cabin and necessary room for her crew, water, tackle, apparel, provisions, and furniture; that the charterer should load the vessel as aforesaid, and should pay freight to the owner, £485; that the privilege of putting on board steerage passengers should belong solely to the charterer; the entire of the between decks, if required, being reserved for the accommodation of such passengers; that the ship-owner should be satisfied for the payment of head-money. The charter-party contained no provision as to who should man and navigate the ship. After the making of this charter-party, but before the sailing of the vessel, William Quayle let to J. W. Shaw & Co., of Liverpool, the privilege of furnishing all the steerage passengers to be taken by the vessel on her voyage.

December 15, 1846, the libellant made a contract with J. W. Shaw & Co. for the passage of himself and family in the vessel to New York, for which he paid £22, in advance. By the terms of the passengers' contract ticket, executed by J. W. Shaw & Co. to the libellant, they agreed to provide the libellant and the members of his family with a steerage passage to New York, including space for luggage, head-money, &c., and to furnish them with water and provisions, as follows: seven pounds of bread, biscuit, flour, oat-meal or rice, &c., at least twice a week, and three quarts of water per day for each adult. December 29, 1846, the vessel sailed with the libellant and his family on board, and carrying, also, about one hundred and sixty other passengers. For the first twenty-five days of the voyage three quarts of water and one pound of bread were given to each passenger daily, including the libellant and his family. At that time the passengers were put upon an allowance of two quarts of water per day, which continued three weeks; from that time only one quart of water a day was allowed them, which continued until March 9, 1847, at which time the vessel arrived in New York, making the length of her voyage sixty-nine days. For the last ten days before

the ship arrived in port, the passengers were put upon an allowance of half a pound of bread a day; and during the voyage there was great suffering by all the passengers, including the libellant and his family, for want of bread and water. The day before the sailing of the vessel, Wilson, her master, was taken sick, and one Thomas Jones was, by the owner, appointed master, and had command of the vessel during her voyage.

The claim of the libel was to recover $500 damages.

William M. Allen, for libellant.

I. Upon the facts shown, the owner is liable to the libellant. 1. The charter-party is most clearly a charter of affreightment, sounding in covenant. In order to charge the charterer as owner for the voyage, he must have the exclusive possession, command, and navigation of the ship. Abb. Shipp. 365, notes 1, 2; [Gracie v. Palmer,] 8 Wheat. [21 U. S.] 605; [Chandler v. Belden,] 18 Johns. 157; [Clarkson v. Edes,] 4 Cow. 470; 3 Kent, [Comm., 5th Ed.] 220; [Pickman v. Woods,] 6 Pick. 248; [Hooe v. Groverman,] 1 Cranch, [5 U. S.] 214. The whole instrument must be taken and construed together, in order to determine its effect. [Clarkson v. Edes,] 4 Cow. 470; [The Volunteer, Case No. 16,991.] Here Quayle is described as merchant and freighter. There appears to be reserved the cabin of the vessel, and necessary room for her crew, water, tackle, apparel, provisions and furniture. If she is detained more than twelve working days by the charterer, he is to pay demurrage. He is to pay freight to the owner, £485; and the ship-owner is to be satisfied for payment of head-money for passengers. Moreover, the charter-party does not declare who shall man and navigate the ship. And it is a general rule that the owner is bound, notwithstanding a charter-party, to put the vessel in a suitable condition to perform her voyage, and to keep her in that condition during the voyage, and to victual and man her for the destined navigation, unless there is a contrary stipulation in the charter-party, or the nature and object of the charter-party devolve that duty upon the charterer. Abb. Shipp. 323, note 1, and authorities there cited. This being the fact, it is submitted, that the case of Parish v. Crawford, 2 Strange, 1251, cited in Abbott on Shipping, 55, and subsequent cases, show the owner in this case to be liable. 2. The putting the libellants on short allowance was not only a breach of the contract, but it was a direct violation of the statute law of England, where the contract was made. 5 & 6 Vict. c. 117, § 6. It was done by the master, who was under the direction of the owner. The common law of England and of this country, except so far as it has been altered by statute, follows the civil law, and holds the owners responsible for the acts of the master

without distinction or limitation. The Rebecca, [Case No. 11,619.] The owner has a remedy against the master. 3. The case of Chamberlain v. Chandler, [Id. 2,575,] shows, "that the contract for passengers is not for mere ship-room and personal existence on board, but for reasonable food, comforts, necessaries, and kindness; that in respect to females, it proceeds yet further, and includes an implied stipulation against obscenity, immodesty, or any wanton disregard of their feelings; and that a course of conduct, oppressive and malicious in these particulars, is no less punishable in courts of justice than personal assaults. And they come within Admiralty cognizance. 4. The owner must be liable both upon the consideration of the benefit arising from the ship, which is the equitable motive, and also, as having the direction of the persons who navigate the vessel. Though he did not receive the freight which the passengers paid for their passage, yet he had the benefit of that freight in general, and thus had that equitable motive which renders him liable. The transactions between the owner and Quayle and Shaw & Co. consisted merely in giving them power to put goods and passengers on board. Again, Shaw & Co., in procuring passengers for the ship, acted in the capacity of agents for the owner, inasmuch as the ship was to furnish provisions and water, and not Shaw & Co. The owner was undoubtedly aware that such was the contract, and such the law where the contract was made, and he assumed the obligations thereby devolving upon him, in receiving the passengers on board and undertaking to convey them to New York. 5. It is conceded that the contract with the libellants to furnish them water and provisions was violated, and that they suffered greatly in consequence. There can be no wrong without a remedy. Now what is the remedy of the libellants? Not against the captain, because he is not liable upon the contracts made by the owner. If not against the captain, it must be against the owner.

II. The libellants may proceed in rem. 1. It is an elementary principle, that there is no remedy without the means of enforcing it. How, then, are remedies on contracts enforced in this State? Is it not through the property of the delinquent? And can it make any material difference with him out of what portion of his property the claim is satisfied? It is conceded that the owner lives in Liverpool, in England; and to say that the libellants must return to Liverpool and prosecute a personal action, would be a denial of right. I take it to be law that when a tort, or any other action for which the owner is liable in Admiralty, has been committed, a proceeding in rem will be sustained. The Rebecca, [Case No. 11,619.] 2. The condition of the owner is not made worse by rendering the ship liable. It is immaterial to him whether the satisfaction

for the injury is made from the ship or from his other property. But it is not a matter of equal indifference to the libellant, whether he is allowed or not to look to the ship for reparation, as this is not only his best, but will sometimes be found to be his only security.

III. This suit is sustainable upon the general principles upon which rest the decisions made in the following cases. Le Caux v. Eden, 2 Doug. (Mich.) 594; St. Amand v. Lizardi, 4 La. 243; Manro v. Almeida, 10 Wheat. [23 U. S.] 473; Dean v. Angus, [Case No. 3,702.]

R. Emmett, for the claimant.

I. The libel states this to be a cause of ill-treatment and short allowance in water and provisions, civil and maritime. The ill-treatment, if any, consists in the short allowance; none other is alleged. Short allowance of provisions, whether from failure of the owner to put them on board, or from the captain's wrongfully withholding them, does not make a cause maritime, though the failure to provide a passage, or the necessary accommodation on board to a passenger, might be of that character. A passage in a vessel does not, in law or by custom, imply the furnishing of provisions. Passengers frequently provide themselves, and this is a matter of personal contract dehors the maritime engagement, which can embrace the passage only.

II. The libel alleges an agreement under which the libellant and his family embarked as passengers, and by which a certain allowance of water and provisions was to be furnished to them; but as it avers no breach of contract by the owner, or any other party, and does not even state with whom such agreement was made, it is not a proceeding ex contractu.

III. The gravamen of the libel is, that the master withheld from and refused to furnish the water and provisions to the libellants, whereby they suffered great want, &c., and for which they claim damages. The charge of withholding implies that the water and provisions so withheld were actually on board, but wrongfully withheld. The proceeding in this case is, therefore, for an alleged tort by the master.

IV. If courts of admiralty have jurisdiction over torts committed by a master of a vessel against a passenger, such jurisdiction is in personam, not in rem. De Lovio v. Boit, [Case No. 3,776;] Chamberlain v. Chandler, [Id. 2,575.] The torts of the master cannot hypothecate the ship, nor produce any lien on it. 2 Browne, Civil & Adm. Law, 143.

V. This cause, on the face of the libel, presents an action of damage. In actions of damage, the process must necessarily be against the person. 2 Browne, Civil & Adm. Law, 347.

VI. Torts cognizable in admiralty are governed by the principles of the common law, and the remedy must be against the person who committed the tort.

VII. All claims in rem, not founded on actual contracts of hypothecation, rest on the following principles: That a service has been rendered in rem, as in the case of mariners' wages, salvage, bottomry, freight; or, that an injury has been received ab re, as in case of collision of vessels at sea. These principles entirely exclude proceedings in rem for torts. 2 Browne, Civil & Adm. Law, 142, 143, 396, 397.

VIII. Though Admiralty may have jurisdiction of a contract with a passenger for his mere passage as a maritime cause, it can only be in personam, whether such contract be made by the owner himself or by the captain as his agent, because it does not come within any principle of a lien in rem, either of hypothecation, service to the ship, or legal liability imposed on or incurred by it.

IX. The facts of this case, as agreed upon in the written statement submitted to the court, show: 1. That if any fraud was committed on the passengers by not furnishing the vessel with a sufficient quantity of water and provisions, (which, however true it might be, is neither alleged in the libel nor shown,) the owner of the vessel, who now claims her, was no party to it. He made no contract whatever with the passengers, and had no control over any such contract or its performance by those with whom the passengers made it. 2. That the master was innocent of any connection with such a fraud, as it appears that he was only appointed the day before the vessel sailed, in consequence of the sudden sickness of her regular master. Also, that in reducing the allowance of water and provisions, the master could be guilty of no tort in a legal sense, however much the libellants may have suffered, because that course was pursued by him under circumstances of peril and necessity, for the preservation of all, including the libellants, and was, therefore, under the circumstances, a meritorious duty on his part. In any view of this case, therefore, either as founded on tort or contract, the libel should be dismissed, and the vessel restored to the claimant, and costs awarded to him.

BETTS, District Judge. The contract proved in this case between the owner of the vessel and the charterer was a contract of affreightment for the voyage, and did not amount to such a letting of the entire ship as to constitute the charterer owner for the voyage. The rule of construction of a charter-party, in this respect, is stated by Mr. Abbott to be as follows: "When, by the terms of the charter-party, the master and mariners are to continue subject to the orders of the ship-owner, he retaining through them the possession, management, and control of the vessel, it is to be con-

sidered as a contract to carry the freighter's goods; but where the merchant engages to pay a stipulated price to the ship-owner for the use of his ship, by the month or year,—takes it and them into his service,—receiving the freight actually earned by it to his own use, the master and mariners becoming subject to his orders, and the general management and control of them and of the vessel being given up to him,—it is a demise of the vessel with her crew for the voyage, or the term specified; the charterer becomes owner pro hac vice, entitled to the rights and subject to the responsibilities which attach to that character." Abb. Shipp. 47–52, and notes. The case of Marcardier v. Chesapeake Ins. Co., 8 Cranch, [12 U. S.] 39, drew in question the construction in this respect of a charter-party of the following nature: One M'Dougal, the general owner of the brig Betsy, let her to the plaintiff by a charter-party of affreightment, excepting and reserving her cabin for the use of the master and mate, and for accommodation of passengers, as therein mentioned, and so much room in the hold as might be necessary for the mariners, and storage of water, wood, provisions, and cables, for a voyage from New York to Nantes; and M'Dougal, by the same instrument, covenanted to man, victual, and navigate the brig at his own charge during the voyage, and to receive on board and carry any shipment of goods made by the plaintiff. The passengers on board of the brig were to be at the joint expense of the parties, and the passage-money was to be equally divided between them. It was held, upon these facts, that M'Dougal remained the owner for the voyage, upon the general principle that, where the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter-party is considered as a mere affreightment sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership. Citing Hooe v. Groverman, 1 Cranch, [5 U. S.] 214. And this conclusion, that the owner of the vessel, notwithstanding the charter, remained her owner for the voyage, was derived in part from the fact that he retained the exclusive possession, command, and management of the vessel, and that she was navigated at his expense during the voyage,—and apart from the circumstance that the whole charter-party, except the introductory clause, "hath granted and to freight let," was one sounding merely in covenant.

In the case of The Schooner Volunteer, [Case No. 16,991,] the same principles were applied to a case quite analogous to the present. The charter-party there, after naming the parties, proceeded to state that the owner, for the consideration thereinafter mentioned, "has letten to freight the whole of the said schooner, with appurtenances to her belonging, except the cabin, which is reserved for the use of the master, and what room is necessary under deck for provisions, wood, water, and cables," for a voyage specified. It further set forth covenants on the part of the owner and charterers respectively, among which were these:—that the owner should pay all and every charge of victualling and manning the schooner, during the voyage, and should furnish the schooner victualled and manned; and that the charterers should bear all other charges, and should pay a specified freight. It was held that, upon the construction of this instrument, the general owner remained unquestionably the owner for the voyage. Mr. Justice Story remarked: "The vessel was equipped and manned and victualled by him, and at his expense, during the voyage; and he covenanted to take on board such goods during the voyage as the charterers should think proper. The whole arrangements on his part, in these respects, sound merely in covenant. It is true, that in another part of the instrument it is said, that he has 'letten to freight,' which may seem to import a present demise or grant (and not a mere covenant,) of the whole schooner for the voyage. But this language is qualified by what succeeds. And the whole schooner is not let; for there is an express exception of the cabin, and certain portions of other room under deck. If the whole schooner, then, was not granted during the voyage on freight, how is it possible to contend that the libellant did not still remain owner for the voyage? The master was his master, appointed by him, and responsible to him; the crew were hired and paid by him; and the victualling and manning were at his expense. He also retained the exclusive possession of a part of the vessel for the voyage, and the control and navigation of her during the voyage. Taking, then, the whole instrument together, it seems wholly inconsistent with the manifest intent of the parties that the charterer should be owner for the voyage." In a later case, also decided by Mr. Justice Story, (Certain Logs of Mahogany, [Case No. 2,559,]) which arose upon a charter-party substantially analogous, as to all points important to the present discussion, to that drawn in question in The Volunteer, that learned jurist, commenting on a discrepancy between the English and American cases, thus restated the American rule: "If the absolute owner does not retain the possession, command, and control of the navigation of the ship during the voyage, and the master is deemed his agent, acting under his instructions for the voyage, though authorized and required to fulfil the terms of the charter-party, the absolute owner must, under such circumstances, be still deemed owner for the voyage, and be liable as such to all persons who do not contract personally and exclusively with the charterer, by a sub-contract with the latter, knowing his rights and character under the charter-party." And it was further held in

the same case, that wherever, upon comparing the various clauses of a charter-party, it remains doubtful whether the charterer was intended to have the sole possession and control of the vessel during the voyage, or to be constituted owner for the voyage, then the general owner must be deemed such; for his rights and authorities over the voyage must continue, unless displaced by some clear and determinate transfer of them. Bearing in mind this presumption against any transfer of the ship to the charterer for the voyage, I proceed, in the light of the foregoing adjudications, to consider what construction is to be placed upon the charter-party proved in this case; and, at the outset, two distinctions may be noticed between the present case and those already cited. In each of the three cases just mentioned, stress was laid in the decision upon the circumstance that the charter-party was, for the most part, one sounding in covenant; but this was adverted to with the qualification that there were also clauses of a contrary import. There is no such cause of embarrassment in the terms of the instrument now before the court. That instrument is one which rests entirely and unequivocally in covenant alone. It contains no words of grant or demise whatsoever. It commences, not by stating that the owner hath "let to freight" the vessel chartered, but by saying that "it is this day mutually agreed" that the ship shall take on board the cargo to be furnished by the charterer; and the remaining clauses of the instrument are not only clearly in the nature of mutual and reciprocal agreements, but are technically so expressed.

The second distinction between the present case and those which have been cited is, that the charter-party now before the court contains no express provision binding the owner to man and navigate the ship during the voyage; a clause which was inserted in each of the charter-parties in the cases referred to. It was contended upon the argument, that the absence of this provision was immaterial, inasmuch as, by a general rule of law, it was said, the owner is bound, notwithstanding a charter-party, to put the vessel in a suitable condition to perform her voyage, and to keep her in that condition during the voyage; and to victual and man her for the destined navigation, unless there is a contrary stipulation in the charter-party, or the nature and object of the charter-party devolve that duty upon the charterer. This rule was stated by counsel on the authority of a note to Abbott on Shipping, (Story & Perkins's Ed. 323.) The cases cited in that note probably support it so far as concerns the obligation of the owner to put her and keep her in suitable condition to perform the voyage. One only of those cases, however, (Goodridge v. Lord, 10 Mass. 483,) bears upon the question of the obligation to man the ship; and that case, so far from sustaining

the rule contended for, holds directly the reverse. In that case, the owners of the vessel brought suit against the charterers to recover moneys in part paid in settlement of seamen's wages, for which they had libelled the ship. There was, in that case, in the charter-party, a stipulation binding the charterers to pay the charges of victualling and manning the vessel; but the court remarked that an action would, under the circumstances, lie for the owners against the charterers to recover the amount paid, even without an express stipulation in the charter-party, or any proof that the charterers were to victual and man the ship; "for that would be the effect of the contract of charter-party, unless it appeared, by the instrument itself, that a different arrangement was intended." The absence of any provision in the agreement of charter-party requiring the owner to man and navigate the ship is, therefore, a circumstance not without weight, as an indication that the intention of the parties was to vest in the charterer the ownership of the vessel for the voyage. It is not conclusive upon the question of intention, however. That intention is to be inferred, not from a single clause of the instrument or a single fact in the case, but from the whole tenor of the charter-party throughout, construed in the light of all the facts proved, which may be admissible as explaining the intent and meaning of the contract. The Volunteer, [Case No. 16,991;] Certain Logs of Mahogany, [Id. 2,559.]

The question upon the point now under discussion may, therefore, be stated thus: Does this charter-party, read connectedly and as a whole, and with a proper reference to the circumstances under which it was executed, so clearly show an intent to vest in the charterer the ownership for the voyage, that the presumption of law in favor of the continuance of the general ownership is overcome? I think it clear that this question must be answered in the negative. The charter-party, as already noticed, sounds wholly in covenant. It describes Graves, the claimant, as "owner," and Quayle, the charterer, as "merchant and freighter." It identifies the vessel in part by the words "whereof Wilson is master;" Wilson being the master appointed by Graves before the chartering, and being, as is shown, in fact continued in that appointment until the day before the vessel sailed, when, in consequence of his sickness, a substitute was placed in command. The instrument contains agreements on the part of the owner that the vessel is tight, stanch, and strong, and every way fitted for the voyage; that she shall take on board a cargo to be furnished by the charterer, not exceeding what she can carry over and above her cabin and necessary room for her crew, water, tackle, apparel, provisions, and furniture; that the privilege of putting on board steerage passengers shall belong solely to the charterer,

the entire of the between decks, if required, being reserved for such passengers; and that if the ship shall be unable to carry cargo and passengers to the stipulated amount, there shall be a proportionate reduction in the hire of the vessel. And on the part of the charterer it is agreed that he shall furnish such a cargo as is contemplated; that he shall pay freight, £485, and demurrage, if more than twelve days are occupied in loading; and that the between-decks shall be calked, &c., at his expense. These provisions clearly indicate, upon the whole, the intention of the parties to retain in the owner the general ownership of the vessel, and to secure to the charterer only rights in the nature of affreightment. This construction is also confirmed by the conduct of the parties under the agreement. The facts are far from countervailing the presumption that no change of ownership was made. The remaining questions in the case are, therefore, to be considered on the basis of the general owner remaining owner for the voyage.

Ships carrying passengers on hire stand on the same footing of responsibility, in that respect, with those carrying merchandise on freight,—passage-money and freight being, in legal acceptation, equivalents. The liability of the vessel in specie, upon a contract of affreightment, is not varied by the circumstance that the contemplated subjects of transportation are passengers, instead of merchandise. A passage contract is, in respect to the vessel's liability, only a species of affreightment, in which the passengers constitute the cargo, and the passage-money answers to the freight. This principle was fully discussed in the late case of The Zenobia, [Case No. 18,209,] in this court, in which the views of the court, upon this subject, were stated at large. The vessel is also liable in rem for merchandise laden on board by the charterers, (The Rebecca, [Id. 11,619;] Abb. Shipp. 47, 52,[3]) as well as upon contracts by the master or the agents of the owners in relation thereto. She is therefore liable in rem upon a contract to carry passengers, equally whether that contract is made with a charterer, or with the master or owners, when the charter-party does not operate to render the charterer owner for the voyage; because, in that case, the charterer acts in the capacity of agent of the owner. She is liable for the conduct of the master as master during the voyage; and for any ill treatment of the passengers by the master, in his capacity as such, a remedy may be had against the vessel herself. She may, indeed, not be liable for mere acts of personal malice or ill-will on the part of the master, not arising out of or connected with the exercise of his duties as master,[4] though for such acts there is clearly a per-

sonal remedy against the master himself. Chamberlain v. Chandler, [Case No. 2,575.] If, therefore, it were made to appear that the treatment complained of in this case was prompted by personal malice and ill-will on the part of the master,—if the withholding of provisions and water had been a tortious act on the part of the master, springing from personal spite and vindictiveness, and disconnected from any such circumstance, as a general lack of provisions on board, for which the owners might be responsible,— there would be ground for doubt whether the libellant was entitled to any other remedy than an action in personam against the master himself. But such conduct on the part of the master is not to be presumed. In this case, the answer does not aver that the ship had sufficient supplies; and there being no proof of that fact, the implication is, that she did not have them to serve out.

It was contended, on behalf of the claimant, that the contract to furnish provisions was not a maritime contract, but a mere matter of personal agreement, independent of the contract for passage, and that it therefore could not be enforced against the ship. There may, undoubtedly, be a contract for passage, in which the passenger undertakes to carry his own store of provisions. Where, however, the contract is not of this description, but the maintenance of the passenger, during the voyage, is undertaken, as well as the transportation of his person, the ship is as much bound to supply wholesome and necessary provision and water, as to provide safe shelter and lodging. There is no ground laid in the case for vindictive or punitive damages against the owner or ship. The agents of the owner pro hac vice, did not fulfil the implied obligation of the ship, and thus relieve her from performing it in this respect, and for that cause there was no ground for compelling the libellants to pay passage-money; and the libellants having paid it, are, because of such violation of the obligation by the ship, entitled to recover it back, the consideration on which it was advanced having failed.

Decree accordingly, with costs.

---

[3] See, also, The Flash. [Case No. 4,857.]

[4] See, also, The Zenobia, [Case No. 18,209,] to the same effect.

