15 F.(2d)—7

THE CONSTANTINOPLE (two cases).

(District Court, E. D. New York. August 4, 1926.)

Nos. 4453, 4454.

1. Shipping ⬤�longrightarrow 157—Contract for carriage of passengers, made and entered on in Roumania, held governed by law of that country.

Contract by a steamship to carry passengers from a Roumanian port to New York, made and entered on in Roumania, held governed by the law of that country.

2. Shipping ⬤⟶165.

The right to proceed in rem for breach of contract to carry passengers is based on a maritime lien.

3. Admiralty ⬤⟶12.

A contract to carry passengers is within the maritime jurisdiction.

4. Shipping ⬤⟶165—Passengers who were left at a way port, without fault on their part, held entitled to damages for breach of contract.

Libelants took passage on respondent steamship from Roumania to New York. The vessel stopped at Palermo to load cargo, and libelants, on being assured by the chief steward and another, whom they were warranted in believing an officer, that she would not leave before the following morning, attended an opera. After they had left the vessel, notice was posted that she would sail at 8 that evening, not having received as much cargo as expected. The captain refused to permit a messenger to be sent to the theater for them, and they were left, being delayed and obliged to secure other passage, and otherwise subjected to damage. Held, that they were entitled to recover for breach of contract.

In Admiralty. Suits by Charles Tisler and Anna Tisler and by Garaber N. Chanian against the steamship Constantinople. Decrees for libelants.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for libelants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Raymond Parmer, of New York City, of counsel), for claimant.

CAMPBELL, District Judge. On stipulation the above-entitled actions were tried together, and, as the facts are substantially the same in both actions, one opinion will be sufficient.

That the libelants, in the month of February, 1922, within the kingdom of Roumania, engaged passage as first-class passengers on the steamship Constantinople, from Constantza, Roumania, to New York, and entered said ship at Constantza as such passengers, from which port the said ship sailed with the libel-

ants on board as first-class passengers, bound for New York, on February 14, 1922, is conceded. It is likewise conceded that said steamship Constantinople arrived at Palermo, Italy, on the morning of February 27, 1922, with libelants on board as first-class passengers, having made several prior stops, and that the said steamship Constantinople left the port of Palermo about midnight of February 27, 1922, without the libelants on board, and proceeded on her voyage leaving them at Palermo.

On conflicting testimony I find the remaining facts to be as follows:

When the Constantinople called at Piræus she received orders to call at Palermo, and expected to take on board about 30,000 cases of lemons at that port, the loading of which would have required the Constantinople to remain at Palermo for 24 hours or more, but instead she loaded only about 12,000 cases, and therefore required a shorter time for loading. The chief steward and Humberto Anto informed the libelants that the Constantinople would remain at Palermo until the following morning, and that libelants would have time to attend the opera Carmen, which was advertised in a newspaper which was brought on board at Palermo after 11:30 a. m. The address of the theatre where the opera was to be given was thereafter written by Humberto Anto and given to one of the libelants about 1:30 p. m.

Relying on this information, the libelants went ashore and later attended the opera; but when they returned, shortly after midnight, they found that the Constantinople had left the quay, and on search for her in the harbor in an open boat they found that she had departed on her voyage. The libelants then communicated with the Constantinople by wireless, seeking to rejoin her, but without success.

The change of intention as to the time of the Constantinople's leaving was not arrived at until after the libelants had left the ship, and the board offered in evidence by the claimant was not displayed, with the hour of leaving stated to be 8 p. m., until after the libelants left the ship, and the libelants were not informed by any one that the ship would leave at 8 p. m. The Constantinople did blow her siren at regular intervals from 8 p. m. until about 10 p. m., when she left the quay, and also after she left the quay, until she finally departed from outside the harbor about midnight.

The captain of the Constantinople did not, although informed that the libelants had gone to the theater named, make any effort to notify them, other than by blowing the siren, nor allow such effort to be made by certain passengers, who offered to pay the expenses thereof. The captain of the Constantinople refused to return for the libelants when requested by them by wireless, and did not comply with their request to wait for them at Naples.

The libelants suffered some damage and were compelled to expend some money for board, clothes, and passage money on another ship, which took them to New York. The libelants, when left at Palermo, had only the clothes they were wearing, the remainder of their clothing being on the ship and carried by it to New York; the same being safely kept on the ship and turned over to libelants in New York.

[1] From the facts as found in the cases at bar, it appears that the contract of carriage was entered into in Roumania and performance began there, but was to be completed in this country, and therefore the contract is governed by the law of Roumania. Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, at page 458, 9 S. Ct. 469, 32 L. Ed. 788; Wiley v. Grand Trunk Ry. of Canada (D. C.) 227 F. 127, at page 130. The actions at bar are brought in rem against the vessel. The claimant contends that suits in rem cannot be sustained, but under the Roumanian law the only remedy is by a suit in personam. This contention, in my opinion, was not sustained.

Mr. Julian De Lodzia, a member of the bar of Bucharest, was called as a witness by the libelants, and testified that under the law of Roumania a passenger had a right to proceed against the vessel for breach of contract of carriage, and referred to a decision of the High Court of Roumania which upheld that right. He further testified that the Roumanian, Italian, and French Codes were the same. The claimant did not call any expert witness to contradict Mr. De Lodzia, and the effect of his uncontradicted testimony cannot be destroyed merely by criticism of counsel. Guaranty Trust Co. v. Hannay, 210 F. 810, at page 814, 127 C. C. A. 360.

[2] The right to proceed in rem is based upon a maritime lien. Benedict (5th Ed.) § 12.

[3] Jurisdiction over contracts of affreightment has been exercised by admiralty courts from the earliest times, and there is nothing in principle to distinguish in this respect the transportation of human beings from that of other portions of animated nature or of merchandise. Benedict (5th Ed.) § 97. This has also been the holding of the courts of the United States. Howland v. The Lavinia, 1 Pet. Adm. 123, 12 Fed. Cas. 739, No.

6,797; The Zenobia, 30 Fed. Cas. 922, No. 18,209; The Aberfoyle, 1 Fed. Cas. 30, No. 16, affirmed 1 Fed. Cas. 35, No. 17; The Relampago, 23 Fed. Cas. 158, No. 13,486; The Pacific, 18 Fed. Cas. 935, No. 10,643; Woolston v. The John A. Warner, 30 Fed Cas. 609, No. 18,033; The Moses Taylor, 71 U. S. (4 Wall.) 411, 18 L. Ed. 397.

[4] I am convinced that the libelants never had notice before they left the ship that she was to sail before 8 p. m., and that the officers who testified that 8 p. m., the time of sailing, was written on the blackboard before 2:30 p. m., when the libelants left the ship, are in error, as I accept as convincing the positive testimony of Mr. Navario that such notice was not written until after that time. That both the chief steward and Humberto Anto informed the libelants that the ship would not leave until the following morning, and that libelants relied on that information, seems to me to be clearly shown.

Claimants contend, however, that the ship is not bound by the information furnished by the chief steward and Humberto Anto, because the chief steward was not an officer of the ship charged with its navigation, and that Humberto Anto was not an officer of the ship. This contention is not, in my opinion, sustained, because the chief steward had exercised authority in reference to the assignment of a different room, when complaint was made by one of the libelants, which warranted the belief that he was an officer, and in the case of Humberto Anto everything indicated that he was an officer high in authority. He wore a uniform similar to the captain's, the only difference being that the captain had four gold stripes, while Anto had but three. He took his meals at the captain's table in the dining saloon, with the captain and certain other officers, and had a great deal to do with the passengers. Those recommended by him to the police were allowed to go ashore, and the police department, as he said, "always take instructions from me or from some other officer." He notified the captain of the absence of the libelants.

It is thus apparent that, with the consent of the captain of the Constantinople, Humberto Anto occupied a position and exercised authority which warranted the libelants in believing that he was an officer with authority, especially over the passengers with reference to their going ashore, on whose information they could rely. The libelants had a right to rely on the color of authority which Humberto Anto displayed and on the information he gave, and were not bound to make particular inquiries to ascertain what was his rating on the ship's articles.

There was no parallel between the leaving of the Constantinople from Palermo without the libelants and the leaving of a ship of a regular line from this port, because in the latter case the time of sailing is advertised and the passenger is notified when his ticket is obtained, while in the case of the Constantinople, as I have found, the ship intended to remain at Palermo until the next morning, and it was not until after the libelants had left the ship with that information that the intention was changed. I cannot find that the ship left the libelants at Palermo because of any prejudice against them on the part of the captain, but solely because of excessive zeal on his part to proceed on his voyage, for the supposed interest of the vessel, without giving due consideration to the rights of the libelants, for which the Constantinople is liable.

The question of the amount of damages should be left to a reference before a commissioner. A decree may be entered in favor of the libelants, with costs and the usual order of reference.